UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHIV PATEL, JAMIE POSNER, and BRIAN GALLAGHER, on behalf of themselves and other individuals similarly situated,<br><br>                                Plaintiffs,<br><br>     against<br><br>ST. JOHN'S UNIVERSITY,<br><br>                        Defendant. | Case No. 20-cv-2114-LDH-CLP<br><br>**CONSOLIDATED<br>CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Named Plaintiffs SHIV PATEL, JAMIE POSNER, and BRIAN GALLAGHER (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated, by their attorneys, bring this class action against Defendant, ST. JOHN'S UNIVERSITY ("Defendant"), alleging the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This class action is brought on behalf of Named Plaintiffs SHIV PATEL, JAMIE POSNER, BRIAN GALLAGHER and those similarly situated who paid tuition and fees for the Spring 2020 semester, Summer 2020 semester, or any future semester at St. John's University ("STJ" or "University") affected by the Novel Coronavirus Disease 2019 ("COVID-19"), and who had their class(es) moved to online learning.

2.    As a result of Defendant's response to COVID-19, Plaintiffs and members of the Class did not receive the in-person benefits and services for which they reasonably expected and

1

bargained for in exchange for tuition and various fees paid, including but not limited to the University General Fee, Student Government Fee, and the University Technology Fee ("Mandatory Fees").

3.     Plaintiffs and Defendant entered into a contract whereby Plaintiffs would provide payment in the form of tuition and Mandatory Fees and Defendant would provide in-person educational services, experiences, opportunities, and other related services.

4.     The Spring 2020 semester was scheduled to run from approximately January 22, 2020 through May 13, 2020. However, the last in-person classes were held on or around February 28, 2020, as the university closed for spring break from March 2 through March 7, 2020, and students never returned to campus following spring break.

5.     On or about March 11, 2020, Defendant announced that students would be required to move out of their residence halls (absent a waiver) and that the deadline to do so would be March 14, 2020.[1] On March 14, 2020, Defendant began to close all on campus student facilities such as libraries and other buildings and non-essential offices.[2] On March 18, 2020, Defendant announced that all classes would be online for the remainder of the semester, in addition to a suspension of all events.[3]

6.     Based on these closures, Defendant failed to uphold its end of the contract to provide in-person and on-campus educational services, opportunities, and experiences.

7.     Despite Defendant's failure to provide the services and experiences as bargained for, Defendant has not offered any refund of the tuition and Mandatory Fees that Plaintiffs and the

---

[1] A Letter from the Division of Student Affairs (Mar. 14, 2020), https://us3.campaign-archive.com/?u=b446252c72a0fb9c974661882&id=b9e4c84566.
[2] Id.
[3] A Letter from the Division of Student Affairs (Mar. 18, 2020), https://mailchi.mp/stjohns/recommended-health-actions.

Class had paid.

8.      In short, Plaintiffs and the members of the Class have paid for tuition for a first-rate education and an on-campus, in-person educational experiences, with all the appurtenant benefits offered by a first-rate university.

9.      However, instead, Plaintiffs were provided with a materially different alternative, which constitutes a breach of the contracts entered into by Plaintiffs with STJ.

10.     As to the Mandatory Fees, Plaintiffs and the Class have paid fees for services and facilities which are simply not provided. For example, STJ assesses the University General Fee, which is "assessed to all registered students per semester regardless of modality [and] includes but is not limited to the use of athletic facilities, the Counseling Center, Health Services, Library, Career Center, Transcripts and Registration.[4] Additionally, STJ charged a Student Government Fee, and a University Technology Fee.

11.     Defendant represented that these fees were charged in connection with various services and events.

- The University states that the University General Fee provides students "use of athletic facilities, the Counseling Center, Health Services, Library, Career Center, Transcripts, and Registration."[5]

- The University states that the Student Government Activity Fee "goes to student organizations in accordance with procedures set by the Student Government."[6] The Student Government ("SGI") "is responsible for the coordination and regulation of the undergraduate student activities and

---

[4] *See* https://www.stjohns.edu/admission/tuition-and-financial-aid/tuition/university-fees (last accessed Aug. 12, 2020).
[5] Id.
[6] Id.

organizations on campus. SGI allocates funds from the Student Activity Fee to student organizations, SGI committees, college representative programming, and student development projects as well as to community building, service-focused, and social activities."[7] For example, SGI allocates Student Activity funds to the "School Spirit" committee. This committee coordinates *staple events* to the St. John's mission (i.e. Winter Carnival) and work to create and program new ones.[8]

- The University states that the University Technology Fee provides students the "use and maintenance of the technology infrastructure, including wireless networking, general classroom technology, online content and specialized technology in lab spaces. The fee will also help fund new innovative teaching spaces and continue to infuse technology into learning spaces, exposing all registered students to the latest technology."[9]

12.    This failure also constitutes a breach of the contracts entered into by Plaintiffs with STJ.

13.    Plaintiffs seeks, for themselves and Class members, the STJ's disgorgement and return of the pro-rated portion of its tuition and Mandatory Fees, proportionate to the amount of time in the respective semesters when the STJ closed and switched to online only learning.

14.    Plaintiffs seek for themselves and Class members protections including injunctive and declaratory relief protecting Class Members for paying the full cost of tuition and Mandatory

---

[7] Student Government, Inc., https://www.stjohns.edu/life-st-johns/new-york-city-your-campus/queens-campus-life/student-government-inc
[8] Student Government, Inc.: Committees, https://www.sjusgi.com/services.
[9] University Fees, https://www.stjohns.edu/admission/tuition-and-financial-aid/tuition/university-fees.

Fees during the pendency of the pandemic in light of the educational services, opportunities, and experiences Defendants can actually safely provide.

## **FACTS**

15.    Plaintiffs and Class Members are individuals agreed to pay tuition and Mandatory Fees for the Spring 2020 semester, Summer 2020 semester, and/or any future semester to STJ affected by COVID-19.

16.    Defendant accepted Plaintiffs' and Class Members' payments in exchange for in-person and on-campus educational services, experiences, and opportunities as detailed in Defendant's documents[10] as they were generated through the application process, the admission process, the enrollment, the registration process, and payment process, such as acceptance materials, application materials, course registration materials, marketing, advertisements, and other public representations.

17.    Students like Plaintiffs applied to, accepted admission at, and enrolled at St. John's based on the on-campus and in-person services that the University promotes, markets, and promises at part of the educational services that Defendant provides.

18.    Based on the academic schedule, the Spring 2020 semester at STJ commenced on or around January 22, 2020 and was scheduled to conclude on or around May 13, 2020. The Summer 2020 semester at STJ was scheduled to commence on or around May 18, 2020 and was scheduled to conclude on or around August 19, 2020.

19.    STJ generally charges tuition and Mandatory Fees on a per credit hour basis, which varies depending on residential status and campus location, and differs for undergraduate and

---

[10] Documents were provided to the Named Plaintiffs reflecting the nature of the relationship, but many of those documents are no longer in their possession, custody, or control – and are believed to be in the possession of St. John's.

graduate students, depending on the program.

20.     Plaintiffs and members of the Class paid tuition and Mandatory Fees for in-person educational services, experiences, opportunities, and other related collegiate services for the entire semester.

21.     Accordingly, when students pay tuition in exchange for enrollment in the on-campus program, such students expect to receive, and Defendant promised to provide, benefits and services above and beyond basic academic instruction, which include but are not limited to:

- Face-to-face interaction with professors, mentors, and peers;
- Access to facilities such as computer labs, study rooms, laboratories, libraries, etc.;
- Student governance and student unions;
- Extra-curricular activities, groups, intramurals, etc.;
- Student art, cultures, and other activities;
- Exposure to community members of diverse backgrounds, cultures, and schools of thought;
- Social development and independence;
- Hands-on learning and experimentation; and
- Networking and mentorship opportunities.

22.     Defendant's connection to the City of New York is acknowledged in the University Mission Statement, which states "As a metropolitan university, we benefit from New York City's cultural diversity, its intellectual and artistic resources, and its unique professional educational opportunities."[11]

---

[11] Mission Statement of St. John's University, New York, https://www.stjohns.edu/about/history-and-facts/our-mission.

23.     Defendant's website and recruitment brochures are the primary means through which Defendant targets prospective new students and attempts to influence such students to apply for enrollment at its University as opposed to other institutions of higher learning.

24.     Through these publications, Defendant markets to and enrolls students in two separate and distinct products.

25.     Defendant specifically markets certain classes and degree programs as being offered on a fully online basis.

26.     Indeed, Defendant dedicates an entire section of its website to these programs, which can be accessed at https://online.stjohns.edu.

27.     Conversely, Defendant's publications with respect to non-online classes are full of references to the on-campus experience, including numerous references to student activities; campus amenities; class size and student/teacher ratios; campus diversity, campus location, and the like.

28.     When visitors enter the home page on Defendant's main website (www.stjohns.edu) they are greeted with a nearly full screen image of a New York City campus.

29.     Prospective students are directed to a link accompanying the image that states: "Stay Close. Stand Out. St. John's University has three beautiful campuses in the New York metropolitan area, so you can shine – without being far from home."[12]

30.     On this "Stand Out" page, prospective students are welcomed with a recruitment video captioned "A Place to Call Your Own."[13]

31.     Quoting this video, "…[A]bove all, St. John's gives you a place to call your own."[14]

---

[12] Stay Close. Stand Out, https://www.stjohns.edu/standout.
[13] Id.
[14] Id.

32.     The narration is transposed over dramatic music and visual depictions of campus buildings, campus activities, and three New York City locations of Queens, Manhattan, and Staten Island.[15]

33.     Below the video, that University represents: "Our students learn with the latest technology *in state-of-the-art facilities that feature new lab spaces, updated classrooms, and more.*"[16]

34.     Just below that representation, Defendant quotes a testimonial of Julia Mulroy, St. Anthony's High School Class of 2020, St. John's Class of 2024, which states, "My first time seeing the campus I immediately fell in love. I am eager to make new friends at St. John's."[17]

35.     On Defendant's "Life at St. John's" page, Defendant advertises, "With more than 180 clubs and organizations, intramural sports, and an active Greek life, there is always something to do on campus."[18]

36.     Further down on this page prospective students read, "The Best of Everything: There is nothing like being on campus in dynamic New York City. Feel the energy of our student clubs and events, and Division I, NCAA athletics-and then take in the surrounding galleries, libraries, museums, plays, restaurants, and shopping"[19]

37.     Below that, prospective students further read, "Campus Life, Big City Edge: When you step on St. John's campus, you will not believe you are in the middle of New York City. Our Queens campus features nearly 100 acres of broad lawns and stately oak trees, timeless architecture, and modern residence halls-all just a short ride from Manhattan. The Staten Island

---

[15] Id.
[16] Stay Close. Stand Out, https://www.stjohns.edu/standout.
[17] Id.
[18] Life at St. John's, https://www.stjohns.edu/life-st-johns.
[19] Id.

campus offers a small college vibe with all the resources of a major university. Explore what we have to offer."[20]

38.     In answering frequently asked questions, Defendant goes on to state:

- Both the library and Sullivan Computer Lab are open 24 hours.[21]

- The *state-of-the-art* fitness center is located in Carnesecca Arena. In addition to having stairmasters, treadmills, dumbbells, ellipticals, life fitness pin loaded machines, and plate loaded free weights, the fitness center also offers a wide variety of free fitness classes. Students also have access to an indoor and outdoor basketball court, tennis courts, soccer field, and outdoor track.[22]

- The Queens campus of St. John's University recently opened the D'Angelo Center, our 127,000 square foot luxury student life center. Boasting fourteen smart classrooms, *state-of-the-art* computer labs, a food court, our "campus living room," and the cheapest Starbucks in New York City, this student center will be enjoyed by students for generations to come.[23]

- The Campus Center at Staten Island features offices of Campus Ministry and Student Life along with a cafeteria, game room, student organization offices and a gymnasium.[24]

- The strikingly modern Manhattan campus contains plenty of meeting and classroom space along with fitness and computer lab facilities, *state-of-the-art* classrooms and an extensive library.

---

[20] Id.
[21] FAQs, https://www.stjohns.edu/admission/undergraduate-admission/faqs.
[22] FAQs, https://www.stjohns.edu/admission/undergraduate-admission/faqs.
[23] Id.
[24] Id.

- Students are not able to apply to both campuses at this time and will need to select a campus when completing the undergraduate application for admission. If you would like to switch campuses after you submit your application, simply email us admhelp@stjohns.edu with your name, date of birth, and the campus you would like to attend.[25]

39.     Upon information and belief, there were no references or disclaimers in any of Defendant's websites, circulars, bulletins, publications, brochures, or other advertisements prior to January 28, 2020, that even referenced the possibility of in-person classes being changed to fully online classes at Defendant's discretion or for any other reason whatsoever after the start of a given term.[26]

40.     In fact, it is clear that, prior to the COVID-19 interruption, Defendant had no plans whatsoever to offer its in-person classes via an online delivery method, and based on past performance Plaintiffs and the Class had no reason to expect such methods.

41.     Those prospective students who are interested in enrolling at the University after consuming the marketing materials described above are invited to complete applications, and some are selected for and offered admission.

42.     In the Acceptance letter sent to Plaintiffs and the Class Defendant promised hands-on experience and the St. John's community, stating "You will learn from top-ranked faculty, form life-long friendships, and have the opportunity for **_hands-on experiences_** that include internships and research in New York City and beyond. Whether cheering in the Red Zone at Madison Square

---

[25] Id.
[26] St. John's University New York Academic Calendar 2019-2020, https://www.stjohns.edu/sites/default/files/uploads/2019-2020Academic%20Calendar%20Faculty%20Format.xls.pdf.

Garden, helping the underserved, or studying at our Rome and Paris locations, you will be part of the St. John's legacy of community, school spirit, and dedication to improving the world."

43.     Additionally, when a student is offered admission to the University, that student receives a number of further communications and has a number of additional interactions with Defendant.

44.     Accepted students are directed toward the "Accepted Student Day Virtual Videos," which begins with a video entitled "Welcome Home, Future Johnnies."[27]

45.     The video states "[S]tudents are able to exclusively access the Financial Information Lab with an up-to-the-second stock market ticker enabling our students to learn about financial markets and business environments."[28]

46.     The video further states, "For budding entrepreneurs, they can take advantage of our incubator, which is in a space adjacent to the Financial Markets Lab, and develop their ideas."[29]

47.     The video further states, " . . . [W]ith our New York City location, students are able to secure some of the top internships with many of the top business firms in the world."[30]

48.     The video further states, "We are proud to *offer (emphasis added) state-of-the-art* labs for computer science and homeland security."[31]

49.     The video further states that students also have access to " . . . [O]ur brand new technology commons with access to virtual reality areas, e-sport stations, apple multi-media stations, 3-d printing and so much more."[32]

---

[27] Accepted Student Day Virtual Videos, https://www.stjohns.edu/admission/undergraduate-admission/accepted-students/welcome-future-johnnies/accepted-student-day-virtual-videos.
[28] Id.
[29] Id.
[30] Accepted Student Day Virtual Videos, https://www.stjohns.edu/admission/undergraduate-admission/accepted-students/welcome-future-johnnies/accepted-student-day-virtual-videos.
[31] Id.
[32] Id.

50.     The video further states, "Communication majors are afforded the opportunity *to take classes in* our brand new media arts and design, or better known as the "M.A.D." lab."[33]

51.     The video further states, " . . . [T]his includes apple stations with Syntac digitizers, as well as multimedia software for media editing and authoring and more."[34]

52.     The video further states, "Students taking classes in the fine arts and mass communications fields can look forward to learning in our newest innovative classroom on campus."[35]

53.     The video further states in reference to their pharmacy program: "Students are guaranteed their seat for the entire six years. They have access to *state-of-the-art* laboratories to refine their pharmacy skills, and prior to their experiential learning, they can utilize the pharmacy lab right on campus for practicing all the necessary skills for that year."[36]

54.     The video further states in reference to their educational program: "We prepare our students to be classroom ready by giving them the opportunity to experience a classroom setting during their freshman year."[37]

55.     Another recruitment video states, " . . . [W]hat I'll miss most about this place . . . is the people . . . these people have traveled from across the country and around the globe to learn and live at St. John's."[38]

---

[33] Id.
[34] Id.
[35] Id.
[36] Id.
[37] Accepted Student Day Virtual Videos, https://www.stjohns.edu/admission/undergraduate-admission/accepted-students/welcome-future-johnnies/accepted-student-day-virtual-videos.
[38] Student Speech, https://www.stjohns.edu/admission/undergraduate-admission/accepted-students/welcome-future-johnnies/accepted-student-day-virtual-videos.

56.     The same video continues to say, "Others travel on multiples trains or buses to get here, because it is here in our inclusive environment that they feel like they belong . . . we have found a home at St. John's."[39]

57.     A drone video on the same virtual videos page that tours Defendant's Queen's campus states students can come to the St. Thomas More Church, " . . . [E]veryday at 8:00am or 12:15pm to enjoy mass."[40]

58.     The "Accepted Student Day Virtual Videos" page contains multiple other videos such as: "Learning with the Latest Technology" which shows all of the lab spaces students at St. John's University are allowed to use, as well as videos entitled "Good Eats", "Fine Arts at St. Johns", "Art on Campus" as well as videos for their Rome Campus, Paris Location, and Ireland location.[41]

59.     The Limerick, Ireland video states "St. John's and Mary Immaculate students learn together in a *campus setting*."[42]

60.     On or around March 9, 2020, STJ announced that because of COVID-19 it would suspend all in-person classes until March 27, 2020, and then on March 16, 2020, announced it would do so for the remainder of the Spring Semester 2020, and that all learning would transition to online.

---

[39] Id.

[40] Droning Around, https://www.stjohns.edu/admission/undergraduate-admission/accepted-students/welcome-future-johnnies/accepted-student-day-virtual-videos.

[41] Accepted Student Day Virtual Videos, https://www.stjohns.edu/admission/undergraduate-admission/accepted-students/welcome-future-johnnies/accepted-student-day-virtual-videos.

[42] Limerick, Ireland, https://www.stjohns.edu/admission/undergraduate-admission/accepted-students/welcome-future-johnnies/accepted-student-day-virtual-videos.

61.     Defendant was unable to provide in-person educational experiences, services, and opportunities that Plaintiffs reasonably expected, and Defendant promised for over 50% of the Spring 2020 semester.

62.     Students, like Plaintiffs, have been deprived of the opportunity for collaborative learning and in-person dialogue, feedback, and critique.

63.     Students, like Plaintiffs, were denied access to facilities, such as libraries, laboratories, computer labs, recitations, and study rooms, are integral to STJ's educational services for which Plaintiffs paid a premium.

64.     Students, like Plaintiffs, were denied access to activities offered by campus life fosters intellectual and academic development and independence, and networking for future careers.

65.     As a result of Defendant's closure, Defendant has not complied with its obligation to provide in-person educational services along with other experiences, opportunities, and services Plaintiffs and the Class reasonably expected and paid for.

66.     Plaintiffs and the Class did not enter into an agreement with Defendant for online education, but rather sought to receive in-person education from Defendant's institution.

67.     Therefore, Plaintiffs and Class Members are entitled to a pro-rata refund of the tuition and Mandatory Fees they paid to Defendant for in-person educational services as well as other marketed collegiate experiences and services that were not provided because STJ transitioned to online-only learning, and the services and experiences for which the fees were intended to pay were not provided.

## JURISDICTION AND VENUE

68.     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

69.     This court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

70.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides within this district.

## PARTIES

71.     Plaintiff SHIV PATEL is an undergraduate student at STJ and is a resident of Nassau County, New York. Plaintiff was enrolled as an undergraduate student at STJ's Tobin College of Business during the Spring 2020 semester. Plaintiff has not received a refund and/or discount of tuition and Mandatory Fees paid to Defendant, despite the fact that STJ has been shut down since on or about March 9, 2020.

72.     Plaintiff JAMIE POSNER was a graduate student at STJ and is a resident of Nassau County, New York. Plaintiff was enrolled as a graduate student at STJ's School of Education during the Spring 2020 semester. Plaintiff has not received a refund and/or discount of tuition and Mandatory Fees paid to Defendant, despite the fact that STJ has been shut down since on or about March 9, 2020.

73.     Plaintiff, BRIAN GALLAGHER, is an individual and a resident and citizen of the state of New York, and was a student enrolled at St. John's University during the Spring 2020 semester.

74.     Defendant St. John's University is a private university whose principal place of business is located at 8000 Utopia Parkway, Jamaica, New York 11439.

75.     Upon information and belief, Defendant has an estimated endowment of approximately $748.9 Million and more than 16,000 enrolled students during the 2019-2020 academic year.

76.     Moreover, upon information and belief, Defendant was allocated more than $12.19 million of federal stimulus under the CARES Act. The CARES Act directs that institutions must use at least half of the funds they receive to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to COVID-19.

## CLASS ALLEGATIONS

77.     Plaintiffs bring this matter on behalf of themselves and those similarly situated. As detailed in this Complaint, Defendant failed to provide the in-person education services the Plaintiffs and Class paid tuition and Mandatory Fees to receive during the Spring Semester 2020, Summer 2020 semester, with the possibility of future semesters.

78.     Plaintiffs and the Class were impacted by and damaged by this misconduct.

79.     Accordingly, this action is ideally situated for class-wide resolution.

80.     The Class is defined as all individuals who paid tuition and Mandatory Fees to attend STJ to receive in-person educational services, experiences, and opportunities during the Spring Semester 2020, Summer 2020 semester, or any future semester, but had their class(es) moved to online learning. ("Class").

81.     The Class is properly brought and should be maintained as a class action under FRCP 23 satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

82.     Numerosity: Class Members are so numerous that joinder of all members is impracticable. Based on enrollment reports, Plaintiffs believe that there are over 8,000 Class Members described above who have been damaged by Defendant's breach of contract.

83.     Commonality: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

      a.  Whether Defendant accepted money from Plaintiffs and Class Members in exchange for a promise to provide services;
      b.  Whether Defendant provided those services as bargained for;
      c.  Whether Plaintiffs and the Class Members are entitled to a pro-rata portion of the tuition and fees paid for services that were not provided.;
      d.  Whether Defendant was unjustly enriched;
      e.  Whether Defendant converted money from the Plaintiffs and Class Members.

84.     Typicality: Plaintiffs are each a member of the Class. Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class was subject to Defendant's breach of contract, unjust enrichment and conversion. Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

85.     Adequacy: Plaintiffs are each an adequate Class representative because their interests do not conflict with the interests of the Class Members they seek to represent; their claims are common to all members of the Class and they have a strong interest in vindicating their rights; they have retained counsel competent and experienced in complex class action litigation and they intend to vigorously prosecute this action. Plaintiffs have no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiffs and

17

their counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiffs and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

86.     The Class is properly brought and should be maintained as a class action under FRCP 23 because a class action is superior to traditional litigation of this controversy. Common issues of law and fact predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading practices.

87.     In addition, this Class is superior to other methods for fair and efficient adjudication of this controversy because, *inter alia:*

88.     Superiority: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

    a.   The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

    b.   The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive-if not totally impossible-to justify individual actions;

    c.   When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Class and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

    d.   This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

    e.   Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

    f.   This class action will assure uniformity of decisions among Class Members;

    g.   The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.  Class Members' interests in individually controlling the prosecution of separate actions are outweighed by their interest in efficient resolution by single class action; and

i.  It would be desirable to concentrate in this single venue the litigation of all plaintiffs who were induced by Defendant's deceptive and discriminatory consumer practices.

89.     Accordingly, this Class is properly brought and should be maintained as a class action under FRCP 23 because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

90.     Plaintiffs and the Class can maintain this action as a class action under FRCP 23(b)(1), (2), and (3)

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT
(On Behalf of Plaintiffs and All Class Members)

91.     Plaintiffs incorporates by reference all preceding allegations as though fully set forth herein.

92.     Plaintiffs brings this count on behalf of themselves and other members of the Class.

93.     Plaintiffs and the other members of the Class entered into contracts with Defendant which provided that Plaintiffs and other members of the Class would pay tuition and fees for or on behalf of students and, in exchange, Defendant would enroll such students and admit them to campus; granting them the full rights and privileges of student status, including but not limited to access to campus facilities, access to campus activities, and live, in-person instruction in a physical classroom.

94.     The contract between Plaintiffs and the University was formed and detailed in documents over the course of the application process, the admission process, the enrollment, the registration process, and the payment processes, including in application materials, acceptance

letters, enrollment acknowledgment materials, course catalogs, websites, student handbooks, marketing materials, and other documents reflecting the nature of the relationship and the expectations of the students at St. John's.

95.     The rights and privileges of students at University are set forth by Defendant through its website, academic catalogs, student handbooks, marketing materials and other circulars, bulletins, and publications.

96.     These rights and privileges form the basis of the bargain on which prospective students agree to accept Defendant's offer of enrollment in exchange for the payment of tuition and fees.

97.     One such right is the ability to be physically present on campus, and fully enjoy the facilities, services, and opportunities provided thereon, including the campus' location and surrounding opportunities on the school's seven campuses, including three in New York.[43]

98.     Defendant does not deny that the physical locations of its campus is the main benefit of enrollment that attracts many students to the University.  See, e.g., ¶ 22.

99.     Defendant offered to provide, Plaintiffs and members of the Class expected to receive, instruction, services, experiences, and access to facilities on the physical campus is further evidenced by the parties' prior course of conduct and reasonable expectations.

100.     The services, experiences, opportunities and classes for which students expected to receive in-person instruction began the semester by offering in-person and on-campus educational services.

---

[43] St. John's University Homepage: See What Awaits, https://www.stjohns.edu.

101.    Each day for the weeks and months leading up to March 9, 2020, students attended physical classrooms, accessed facilities, and utilized services in accordance with the contract and Defendant provided such in-person and on-campus educational services and access to facilities.

102.    Likewise, upon information and belief, most students were provided with syllabi and other documents that referenced class meeting schedules, locations, and physical attendance requirements.

103.    Accordingly, it is clear that Defendant offered to provide live, in-person and on-campus educational services, including experiences, services and facilities, and members of the Class accepted that offer by paying tuition and fees and attending classes and utilizing the services and facilities, during the beginning of the Spring 2020 semester.

104.    Based on this mutual assent, Plaintiffs and other members of the Class fulfilled their end of the bargain when they paid tuition and fees for the affected semester, either by paying out of pocket or by using student loan financing, or otherwise.

105.    However, the University breached the contract with Plaintiffs and the Class by moving all classes for the Spring 2020 semester and other semesters to online distance learning platforms, and restricting the on-campus experience without reducing or refunding tuition and fees accordingly.

106.    It is clear from the facts and circumstances that Defendant offered two separate and distinct products, one being live, in-person, on-campus education, with its ancillary and related services and the other being online distance education.

107.    Plaintiff and members of the Class accepted Defendant's offer for live, in-person, on-campus education and services and paid valuable consideration in exchange.

108.    However, after accepting such consideration from Plaintiffs and the Class, Defendant provided an entirely different product, which deprived Plaintiffs and the Class of the benefit of the bargain for which they had already paid.

109.    Defendant retained tuition and fee monies paid by Plaintiffs and other members of the Class, without providing them the full benefit of their bargain.

110.    Plaintiffs and other members of the Class have suffered damage as a direct and proximate result of Defendant's breach amounting to the difference in the fair market value of the services and access for which they contracted and the services and access which they actually received.

111.    As a direct and proximate result of Defendant's breach, Plaintiffs and the Class are legally and equitably entitled to damages, to be decided by the trier of fact in this action, to include disgorgement of the difference between the fair market value of the online learning and services provided versus the fair market value of the live, in-person instruction  and services on a physical campus for which they contracted.

## SECOND CAUSE OF ACTION
## CONVERSION
### (On Behalf of Plaintiffs and All Class Members)

112.    Plaintiffs repeat and re-allege the factual allegations above, as if fully set forth herein.

113.    Plaintiffs bring this claim themselves and on behalf of the members of the Class.

114.    Plaintiffs and the Class have made financial arrangements that required them to make payments before Defendant provided services.

115.    Defendant accepted Plaintiffs' monies with the express understanding that the Defendant would provide in-person and on-campus educational experiences, opportunities, and services.

116.    Defendant was unable to perform such services or provide such experiences and opportunities.

117.    Defendant has converted Plaintiffs' and the Class' property – namely their tuition and fees - into their own property[44] without just compensation.

118.    Defendant has converted Plaintiffs' tuition and fees into its own monies without providing the in-person and on-campus services that Plaintiff and the Class gave their money for.

119.    Defendant's failure to return the tuition and fees paid by its students is a separate and distinct harm from its failure to provide the promised and agreed-upon in-person learning and on-campus services.

120.    It is inequitable for Defendant to convert such funds into its own profits despite the failure to provide such services, experiences, and opportunities.

**THIRD CAUSE OF ACTION**
**COMMON LAW UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and All Class Members in the Alternative)**

---

[44] Indeed, colleges and universities must be able to separately account for student payments, as well as financial aid received on an individual student's behalf, as these institutions are frequently required to issue refunds to the government and the student for instances where the student enrolls, but does not complete classes for which the institution has received financial aid payments from the federal government. The Higher Education Act ("HEA"), Title IV, governs federally funded student financial aid programs for college and post-secondary vocational training. *See* 20 U.S.C. §§ 1070–1099 (1990 & 1992 Supp.).  The HEA requires that when a student withdraws partway through the enrollment period, the institution must refund a certain portion of the charges to account for its reduced educational obligations toward the student. *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1269 (D.C. Cir. 1996).  Thus, it is beyond dispute that any college or university receiving any tuition payments through government-provided financial aid must be able to account for what was paid for each individual student.  This means that each student's tuition funds must be capable of being separately identified and sequestered, and a claim for conversion of those funds can be properly sustained.  Moreover, discovery will flesh out more information about the particular accounting practices employed by Defendant.

121.    Plaintiffs repeat and re-allege the factual allegations above, as if fully set forth herein.

122.    In the alternative, Plaintiffs brings this claim for unjust enrichment themselves and on behalf of the members of the Class.

123.    By paying STJ tuition and the Mandatory Fees for the Spring 2020 semester, the University agreed to, among other things, provide an in-person and on-campus live education as well as the services and facilities to which the Mandatory Fees that were paid pertained to throughout the semester.

124.    Defendant has retained the benefits of the amount of tuition and fees that Plaintiffs and Class members have provided – without providing the benefits that Plaintiffs and Class members expected and were owed.

125.    For example, Defendant failed to provide Plaintiffs and Class Members access to any on-campus facility after in or around March 8, 2020. Yet Defendant assessed Plaintiffs with tuition and Mandatory Fees that covered the cost of upkeep and maintenance of such facilities, services, costs, and expenses.

126.    Plaintiffs were not able to access such facilities or services remotely.

127.    Plaintiffs paid tuition and Mandatory Fees with the expressed understanding that such costs included the in-person classes, services, opportunities, and experiences that STJ has previously marketed, promoted, or made available prior to Covid-19.

128.    The costs incurred for having an online only program is significantly lower than the overhead needed to provide classes and services on campus.

129.    Defendant has been unjustly enriched by Plaintiffs' payment of tuition and Mandatory Fees.

24

130.    Despite not being able to provide such services, STJ failed to provide reimbursements for tuition and fees despite the diminished value of the education and other experiences that it provided, and the reduced benefits associated with the fees.

## DEMANDS FOR RELIEF

131.    Plaintiffs demand a trial by jury on all issues.

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

(a)    Declaring this action to be a proper class action and certifying

Plaintiffs as the representatives of the Class under FRCP 23;

(b)    Awarding monetary damages, including damages;

(c)    Awarding punitive and treble damages;

(d)    Awarding Plaintiffs and Class Members their costs and expenses incurred in

this action, including a reasonable allowance of attorney's fees for Plaintiffs'

attorneys and experts, and reimbursement of Plaintiffs' expenses; and

(e)    Granting such other and further relief as the Court may deem just and proper.

Dated:      April 21, 2021
            Carle Place, NY

LEEDS BROWN LAW, P.C.

Brett R. Cohen, Esq.
Jeffrey K. Brown, Esq.
Michael A. Tompkins, Esq.
One Old Country Road, Suite 347
Carle Place, NY 11514
Tel: (516) 873-9550
jbrown@leedsbrownlaw.com
mtompkins@leedsbrownlaw.com
bcohen@leedsbrownlaw.com

25

**THE SULTZER LAW GROUP, P.C.**
Jason P. Sultzer, Esq.
Benjamin Zakarian, Esq.
85 Civic Center Plaza, Suite 104
Poughkeepsie, New York 12601
Tel: (854) 705-9460
sultzerj@thesultzerlawgroup.com
francisj@thesultzerlawgroup.com

**MOREA SCHWARTZ BRADHAM
FRIEDMAN & BROWN LLP**
Peter B. Katzman
444 Madison Avenue, 4th Floor
New York, NY 10022
Tel: (212) 695-8050
Email: pkatzman@msbllp.com

**ANASTOPOULO LAW FIRM, LLC**
Roy T. Willey, IV *
Eric M. Poulin *
32 Ann Street
Charleston, SC 29403
Tel: (843) 614-8888
Email: roy@akimlawfirm.com
eric@akimlawfirm.com

**TOPTANI LAW PLLC**
Edward Toptani
375 Pearl Street, Suite 14106
New York, NY 10038
Tel: (212) 699-8930
Email: edward@toptanilaw.com


*Pro hac vice motion forthcoming*


*Counsel for Plaintiffs and the Putative Class*